May it please the Court, Patrick Hooper for Appellant Peter Mackby. I would like to reserve five minutes for rebuttal, so therefore I'm going to try to be brief. I know Your Honors know the question before the Court right now is whether the District Court judgment is excessive. I know Your Honors know that's a question of law to be decided de novo by the Court. The amount of the judgment was $730,000. According to the Government and the District Court bought into this argument, Mr. Mackby's conduct in this case authorizes a judgment under the False Claims Act of between $730,000 and $86 million. So the Government and the District Court says therefore $730,000 must be eminently reasonable. We believe this argument would render the False Claims Act unconstitutional for at least two reasons. First, because it would constitute an unlawful delegation of authority. As this conduct is prohibited, it must also determine within some reasonable range what the penalty for that would be. Any law that could be interpreted that would allow a penalty of between $730,000 and $86 million we submit would be an unlawful delegation of authority to the Executive Branch and most respectfully to the Judicial Branch. Second, even if Congress could delegate that kind of authority, the kind of authority to award between $730,000 and $86 million, then we believe that would deny due process to defendants and to a defendant like Mr. Mackby because there would be no reasonable way of knowing what penalty would result from what conduct. So it's our position that the Government's primary position in this case must be rejected. Now I want to move to the excessive fine analysis. Can I interpose just a fact question as just a matter of curiosity? Did you represent Mr. Mackby? Was there an investigation leading up to the filing of the civil complaint? Yes. And you represented him during that investigation? I got in at the tail end of that investigation, Your Honor. Was there ever a possibility that he might be criminally charged? I think you better ask the Government. I know there was a criminal attorney involved at some point, but I'm not privy to that. That wasn't you. Pardon me? That was not you. That was not I. No, no. I'm a civil attorney, somewhat uncivil at times, but civil. Yeah. Anyways. You're perfectly civil. Oh, thank you. With regard to the two components of the judgment here, there is the treble damages, which was 58,000 times 3, and then there are the penalties, 111 claims times 5,000. Now, we contend the damages component of this judgment is excessive because the Government failed to prove or even offer any evidence in this record of any loss, harm or injury caused by Mr. Mackby's conduct. And there's a reason why the Government didn't offer any evidence and couldn't prove this, because this is one of those unique cases where services were actually rendered undisputed, the services were appropriate. This is not one of those false claims cases where there's an allegation of worthless services, and the services were medically necessary. In fact, all of these services were rendered by the patient or were ordered to be performed by the patient's attending physician, ordered that they get physical therapy. And the Mr. Mackabee have collected any of the sums that he did if he had been forthright with the Government? Yes. Yes. He would have collected everything except for the cap, the amount in excess of the cap. But this Court held previously if that had been the case, then it's really not a coverage issue at that point, the amount in excess of the cap. It's like if you have private insurance and you are capped at a certain amount. In this case, this Court said in its previous decision, it's likely the patient's would have gone to a physician or would have gone to some other kind of provider or supplier where the benefits would not have been capped. So the important point is maybe Mr. Mackabee would not have received the amount in excess of the cap, but the Government would have had to pay out that amount or more. Well, is that right after Mr. Leary leaves Mr. Mackabee's business? Because at that point, he no longer has a licensed physical therapist who's an owner of the business. And obviously, Your Honor, it's very honed in on a very important question here. It's our position, by the way, that that really was not the subject of the district court decision. But let's talk about it anyways. When Mr. ---- I'm pursuing Judge Hopkins' question, really. Well, it's a very important point, and we've gotten into a lot of technical things in this case, which made us wonder why there was liability in the first place, because these are so complicated. But as Your Honors know, under the statute, Medicare covers physical therapy services if they are rendered by physicians, if they are rendered by rehabilitation agencies and other kinds of institutions, and this is an important thing, and if they're rendered by independent physical therapists. Now, most recently in 1998 and before then, there has been some dispute over what constitutes a physical therapist in independent practice. But I think it is clear in this case that so long as the services were being rendered by licensed physical therapists, the fact that there was a lay corporation that employed them, Mr. McAbee's Corporation, M1 Enterprises, Asher Clinic employed them, that would not mean they were not an eligible supplier. Now, you know how much Mr. McAbee was paid by the government after he no longer had a physical therapist? You mean? Well, I know between the 1992 and 1996 period, I believe, and the government can correct me, that the total payments, including the amounts in excess of the cap for Medicare over that five-year period, I believe were about $330,000. So even if one, and I don't want to concede that that was the point, but even if one were to concede that it was a $330,000 payment, this concept where the government says, but we therefore could impose a range of damages and penalties from $730,000 to $86,000,000, I think presents a real problem with interpreting this statute. But I do want to come back to this. It's our position, and it's critical, that just because there were payments in excess of the cap doesn't mean the government was damaged. We believe damages would require them to prove they got worthless services, the services weren't actually rendered, or something like that. Now, this is another critical point, Your Honors. In their open ---- Before you jump into that, let's assume I'm a Medicare provider and I'm a physician. And I my office seeks reimbursement from the government for services provided. And at some point after I begin doing that, the Board of Medical Examiners in the state where I practice takes my license away. And I no longer have a license. And I don't tell the appropriate government agency about that. And I continue to provide services and continue to get paid. Isn't that in essence what happened? Most respectfully, I don't believe so. And I don't mean to be overly technical, but this concept of provider becomes important here. Because it really wasn't a ---- he was not a provider. And in your hypothetical, you said the physician's not a provider. He's not a provider either. I mean, you used the word provider as physician. Neither of them are, quote, providers. Therefore, they don't have to have agreements. They can be non-participating suppliers and physicians. If Medicare patients come to them, they can treat them and they can get paid. But to answer your question, if a doctor doesn't tell the government that he's not licensed, yes, he should not get paid under those situations. We don't believe that's the situation here. We believe there continue to be licensed physical therapists who are rendering these services. But were they licensed physical therapists that would have qualified this as a Part B institution? That is to say, in order to qualify as under Part B for a licensed physical therapist, they have to essentially be, as I read the regulation, independent contractors and not employees. Your Honor, you're right. That's how you read it in the most technically way. In 1998, the Secretary said that's overly technical. We put that in the brief. We are going to recognize because the reality is independent physical therapists practice in groups that are owned by lay corporations. Our position is if the statute allowed the Secretary to do that prior to 1998, as the Secretary obviously conceded, then or after 1998, then they could do it prior. And so our point is there would have been a technical problem there and we would have had a ---- Of course, that's not directly an issue. That's only an issue in the sense of proportionality of the harm. Yes. Yes. And let me just say, because I see I'm running out of time here, the government relied very heavily on the district court decision in Hayes v. Hoffman at pages 40 and 44 of its brief for the proposition that even if the government doesn't suffer a loss or damages, there can still be damages awarded under the False Claims Act. As Your Honors know, Hayes v. Hoffman was reversed recently by the 8th Circuit and we like the reasoning in that decision. Now, I've run out of time. May I have a few more minutes or ---- I'll give you a minute for rebuttal. Okay. Thank you. Thank you for your argument, counsel. I appreciate it. Ms. Winslow. May it please the Court. Sarah Winslow for the United States. I would first like to address the issue of whether Mr. Matthey could have obtained any money had he been truthful with the government. The answer is no. After Mr. Leary left, Mr. Matthey had no way to truthfully submit claims to the government. That is why he essentially stole his father's number and billed with that number instead. Do you agree with the ballpark number counsel gave as representing the total amount post Leary leaving and as the result of excess cap from using his father's number? He said it was roughly $330,000. It's $331,078 to be exact, Your Honor. So it sounds like you do agree. Yes. And that's not exactly from when Mr. Leary left, but it's the time period at issue in the trial. How do we get from that to $730,000? Well, Your Honor, the way that it was actually arrived at by the district court is because the government drastically limited its request for damages and penalties. There were 8,499 false claims submitted with Dr. Matthey's, the father's number, during the time period at issue in the trial. At trial, we only asked for a subset of those damages, and we only asked for a very small subset of those claims to incur penalties, just 111. What was the total amount of the government request? The total amount of the government request was $729,454, exactly what the district court requested. You got every dime you asked for. Yes, Your Honor. And I just would like to point out that Judge Fletcher's point that the regulation required physical therapists to be essentially independent contractors to bill Medicare, that's exactly right. That was the regulation that was in place at the time of the conduct at issue. Mr. Matthey argues that a 1998 change in the regulations exonerates him. That's not correct. Mr. Matthey was required to comply with the regulations that were at issue at the time. When the regulation was changed, HHS, the Department of Health and Human Services, made clear it was changing the definition. It did not make it retroactive. It said, from this point forward, this is what happens. Mr. Matthey had to comply with the regulations in place at the time. He did not. He violated them. He used his father's number to pretend that he was complying. And because of that, the government paid out over $300,000 that it would not have paid out had the claims been truthful. Did the district court take into consideration that the services were actually provided to beneficiaries? Yes, Your Honor. The district court did. And this Court, on Mr. Matthey's first appeal, took that into consideration as well. And both courts relied on the Fifth Circuit case of Peterson v. Weinberger, which case is discussed in the briefs, and it has extremely similar facts to this case. And in that case, the Fifth Circuit found that the services were rendered, but because they were billed by an entity ineligible to bill, the amount that Medicare paid out was the damages. The fact that the False Claims Act authorizes such potentially large judgments in this case, it's not an accident. It shows that Congress views these as very serious offenses. And it's the product, in this case, of the repeated nature of Mr. McBee's offense. He submitted false claims thousands of times over. Was there, if you know, was there ever consideration to a criminal prosecution? Your Honor, there's nothing in the record about any criminal prosecution. And you weren't involved in any such decision? I was not the trial attorney, so I cannot address what happened. Okay. If the Court has no further questions, I just ---- I don't see any. Thank you for appearing here today. We appreciate your argument. One minute for rebuttal. Thank you very much. You bet. Thank you. I'm going to start running here, Your Honor. Peterson is a coverage case. In 1972, Congress amended the statute to allow physical therapists ---- yes, there may be a technicality here, but it's not a coverage issue. Most importantly, the question continues to be that if the government hadn't paid Mr. McBee, if Mr. McBee had been, quote, found now, and not had the opportunity to lose money for seven years serving Medicare patients, then they would have had to pay some other provider and perhaps more, some other supplier and perhaps more. It's because these orders are ---- these services are ordered by doctors, so the patient, if he can't get them at Asher Clinic, will go somewhere else. So I can't see how the government suffers a loss. Your argument is no harm, no foul. Well, it's not no harm, no foul because they say that's Peterson. But Peterson is different because no harm, no foul here because we don't have a coverage issue. It's not like these were not covered services. These were covered services. In other words, the Medicare had to cover them. They just would not have paid Mr. McBee. They would have paid someone else and maybe even more. So we understand the liability. And Mr. McBee has been slapped a million times for that. Now we're here to figure out how much the penalty and damages should be. Okay. Thank you for your argument. I appreciate it. Thank you both sides for the argument. They're quite helpful. The case just argued will be submitted and the Court will stand in recess for the debate.
judges: Hawkins, W.fletcher, King